# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| ANITRA POLLARD, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 12-cv-1010 (KBJ) |
| | ) | |
| DISTRICT OF COLUMBIA, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION</u>

In October of 2011, officers from the District of Columbia's Metropolitan Police Department ("MPD") arrested Kevin Witherspoon—a then-29-year-old D.C. resident with an intellectual disability and a phonological disorder—for his participation in what is known as a "buy/bust" drug operation.  The undisputed facts establish that Witherspoon got into an unmarked police car with an undercover police officer, and then, at the officer's prompting, directed the officer to two different locations, where he purchased marijuana and cocaine with money the officer provided and brought the drugs back to the officer.  Although Witherspoon was promptly arrested, he was not ultimately prosecuted; nevertheless, his sisters, Anitra Pollard and Lakeisha Witherspoon ("Plaintiffs"), have filed the instant action under 42 U.S.C. § 1983 against MPD and various individual officers (collectively, "Defendants") to recover for what they contend was an egregious violation of Witherspoon's rights.  Plaintiffs' complaint alleges that Witherspoon's arrest breached federal and state law in myriad ways, the most notable of which is the assertion that the officers with whom Witherspoon

interacted violated the Fourth and Fifth Amendments because they lacked probable cause to arrest him.

Before this Court at present is Defendants' combined partial motion for summary judgment on the basis of qualified immunity and partial motion to dismiss the complaint.  Defendants' motion addresses only the complaint's constitutional claims, and given the limited scope of the parties' discovery thus far, Defendants seek summary judgment under Federal Rule of Civil Procedure 56 only with respect to the constitutional claims that hinge on the legitimacy of the arrest: Count I (state endangerment in violation of the Fifth Amendment), Count II (false arrest in violation of the Fourth Amendment), and Count IV (Fifth Amendment abuse of process).  (*See* Def.'s Mem. in Supp. of Defs.' Mot. to Dismiss & Summ. J. ("Defs.' Mem."), ECF No. 101 at 8–9.)[1]  In regard to these counts, Defendants argue that, even taking the facts in the light most favorable to Plaintiffs, Plaintiffs have not established that Witherspoon's arrest violated any constitutional right, and that, in any event, no such right was clearly established.  Defendants also request that Plaintiffs' other constitutional claims—Count III (unlawful taking under the Fifth Amendment), Count V (state endangerment at the D.C. jail in violation of the Fifth Amendment), Count VI (failure to protect in violation of the Fourth and Fifth Amendments), Count VII (failure to train MPD officers in violation of the First, Fourth, and Fifth Amendments), and Count IX (failure to protect Plaintiff Lakeisha Witherspoon in violation of the Fifth Amendment)—be dismissed under Rule 12(b)(6), for failure to state a claim upon which relief can be granted.  (*See id.*)

---

[1] Page numbers herein refer to those that the Court's electronic filing system automatically assigns.

As explained fully below, after a motion hearing and a thorough review of the record and the parties' respective arguments, this Court agrees with Defendants that none of Plaintiffs' constitutional claims passes muster under Rule 56 and Rule 12, and therefore, the Court concludes that Defendants' motion for summary judgment and dismissal must be **GRANTED**.  Moreover, the Court will decline to exercise supplemental jurisdiction over Plaintiffs' remaining state law claims, and thus, the state law claims will be **DISMISSED WITHOUT PREJUDICE**, leaving Plaintiffs free to pursue them, should they choose to do so, in state court.

A separate order consistent with the memorandum opinion will follow.

## I.   BACKGROUND

### A.   Facts Regarding Witherspoon's Arrest

As mentioned above, this case arises out of a specific encounter between Kevin Witherspoon and certain officers of the MPD on October 21, 2011.  The basic facts regarding the nature and circumstances of the interaction between the officers and Witherspoon are hotly disputed; the thrust of each side's recitation is as follows.

#### 1.   Plaintiffs' Version

According to the Second Amended Complaint, Witherspoon was born with a severe intellectual disability and has the intellectual capabilities of a child.  (*See* SAC ¶¶ 16–22.)  Witherspoon's mother died in 2004, and he now lives with his sister Lakeisha Witherspoon and receives support from older sister Anitra Pollard, who is also his guardian and conservator.  (*See id.* ¶¶ 23–25.)

On October 21, 2011, Lakeisha allowed Witherspoon to leave their residence by himself and go to the corner store with a small amount of money.  The complaint

alleges that, on his way there, Witherspoon was approached by Defendant Officers
Durham and Hall, who "convinced him" to enter their undercover police vehicle. (*See
id.* ¶¶ 31–33.) Plaintiffs assert that the officers then drove to an area of known drug
activity, where they (along with the defendant officers Walker, Jackson, and Anderson)
"supervised, directed, and engaged" Witherspoon to negotiate the purchase of marijuana
and cocaine. (*See id.* ¶ 38.) The complaint states that the officers immediately arrested
Witherspoon and, thereafter, filed a report that failed to mention Witherspoon's
intellectual disability. (*See id.* ¶ 40.) Plaintiffs also contend that Witherspoon was
placed in the general population at the D.C. jail, where he "suffered violent threats"
(*see id.* ¶ 44) and "sustained injury" (*see id.* ¶ 45).

Plaintiffs assert that, following Witherspoon's arrest, a grand jury refused to
indict him for these drug transactions, and the United States Attorney declined to
prosecute him. (*See* ECF No. 30, Exs. 2 & 3.) However, Plaintiffs allege that
Witherspoon was branded a police informant in his community, which placed him and
his family in danger. (*See* SAC ¶¶ 52.) Their property was allegedly vandalized, and
Plaintiffs assert that they were forced to move due to death threats. (*See id.* ¶¶ 53–54.)

### 2. Defendant's Version

As noted, Defendants contest various salient aspects of Plaintiffs' story.
According to Defendants, Officer Durham was driving around the Seventh District in an
unmarked vehicle when Witherspoon approached his car and asked for a ride. (*See*
Defs.' Statement of Material Facts ("Defs.' SMF"), ECF No. 101 at 29–31, ¶¶ 2, 5;
Dep. of Hampton D. Durham ("Durham Dep."), ECF Nos. 101-2 & 108-8, at 7:3–18,
11:15–12:3.) Officer Durham purportedly observed a known gang-affiliation tattoo on
Witherspoon's face (*see* Defs.' SMF ¶ 4); he then asked Witherspoon about obtaining

marijuana (*see id.* ¶ 5).  Witherspoon allegedly said that he could obtain marijuana for Officer Durham.  (*See id.* ¶¶ 5.)

Purportedly following Witherspoon's lead, the officers went back to the apartment building that Witherspoon had originally emerged from.  (*See id.* ¶ 6.) Witherspoon entered the building and purchased marijuana in an apartment that he had been to "plenty of times" before, using money that Officer Durham had given him.  (*See id.* ¶¶ 5–6.)  Defendants assert that Witherspoon then directed Officer Durham to a new location and purchased cocaine for Officer Durham using money that Officer Durham had provided.  (*See id.* ¶ 7.)  Notably, Officer Durham claimed that he did not perceive anything unusual about Witherspoon at any point during these interactions (*see id.* at 31 ¶ 8), and after the second drug transaction, the buy/bust team arrested Witherspoon for distribution of cocaine in violation of 21 U.S.C. § 841 (*see id.* ¶ 9; Ex. 4 to Defs.' SMF at 2).

### B.    Procedural History

Plaintiffs filed the initial complaint in this matter on June 20, 2012 (*see* ECF No. 1), and an amended complaint on September 4, 2012 (*see* ECF No. 30).  The district judge to whom the case was originally assigned ordered discovery on the sole issue of whether Witherspoon's arrest was supported by probable cause.  (*See* ECF No. 32.) The case was then reassigned to the undersigned on April 4, 2013.  After a period of limited discovery, the parties each moved for summary judgment on the probable cause question.  This Court denied both parties' motions for summary judgment on February 14, 2014, because genuine issues of material fact remained with respect to whether or not Officer Durham had probable cause to arrest Witherspoon.  (*See* Order, ECF No.

48.)[2]

On January 6, 2015, this Court held an initial scheduling conference and the parties proceeded with broader discovery.  During the discovery period, Plaintiffs filed a motion for leave to file a second amended complaint, which the Court granted (*see* ECF Nos. 69, 87), and Plaintiffs filed the new complaint (the one at issue at present) on May 14, 2015 (*see* ECF No. 88).  Plaintiffs' Second Amended Complaint (hereinafter referred to as "SAC") makes eight claims that allegedly arise under the U.S. Constitution: state endangerment during the undercover drug operation in violation of the Fifth Amendment (Count I); false arrest in violation of the Fourth Amendment (Count II); unlawful taking in violation of the Fifth Amendment (Count III); abuse of process in violation of the Fifth Amendment (Count IV); state endangerment at the D.C. jail in violation of the Fifth Amendment (Count V); failure to protect in violation of the Fourth and Fifth Amendments (Count VI); failure to train MPD officers in violation of the First, Fourth, and Fifth Amendments (Count VII); and failure to protect Plaintiff Lakeisha Witherspoon in violation of the Fifth Amendment (Count IX).  (*See* SAC ¶¶ 55–143, 150–159.)  In addition, the complaint claims that certain Defendants are liable for negligent training and supervision under D.C. common law (Counts VIII and X).[3] (*See id.* ¶¶ 144–149, 160–165.)

Shortly after the SAC was filed, Defendants sought to stay discovery, asserting

---

[2] In a series of procedural steps that are not relevant to the instant opinion, this Court also granted and subsequently vacated its order granting Defendant Wiedefeld's motion to dismiss, due to newly discovered audio evidence.  (*See* ECF Nos. 59, 87.)

[3] Counts I, II, III, and IX are brought against the District of Columbia and each of the officers allegedly involved in the undercover drug operation: Hampton Durham, Christopher Hall, Kathleen Wiedefeld, Desiree Walker, Isaac Jackson, and Sherman Anderson (each in their official and individual capacities). Count VI is brought against the District, the officers, and Police Chief Cathy Lanier (in her official capacity).  Counts V, VII, VIII and X are brought solely against the District and Chief Lanier.

that they intended to file a motion to dismiss on the basis of qualified immunity.  (*See* ECF No. 92.)  The Court denied this stay request (*see* ECF No. 95), and discovery proceeded.

Defendants filed the instant partial motion for summary judgment and partial motion to dismiss the complaint on June 16, 2015.  (*See* Defs.' Mem.)  Defendants have moved for summary judgment on Plaintiffs' claims of state endangerment (Count I), false arrest (Count II), and abuse of process (Count IV), and have moved to dismiss the remaining constitutional claims (Counts III, V, VI, VII, and IX) for failure to state a claim.  (*See* Def.'s Mot. to Dismiss & for Summ J., ECF No. 101.)  In the motion, Defendants argue that the arresting officers are entitled to qualified immunity because no constitutional violation took place during the undercover drug operations, and there was certainly no violation of a clearly established constitutional right, even when the facts are construed in the light most favorable to Plaintiffs.  Defendants assert that this is so because the full record demonstrates that Officer Durham had sufficient probable cause to arrest Witherspoon (*see* Defs.' Mem. at 12–20), and Plaintiffs' entrapment-based argument fails as a matter of law (*see id.* at 20–23).  Defendants also contend that Plaintiffs' remaining counts—i.e., the constitutional claims that do not stem directly from the alleged illegality of Witherspoon's arrest—fail to allege constitutional violations (*see id.* at 23–33).  For their part, Plaintiffs' brief in opposition to Defendants' motion disagrees with Defendants' assessments of the facts and the law; specifically, Plaintiffs' argue that the facts are sufficient to demonstrate a series of established constitutional violations relating to Mr. Witherspoon's arrest and treatment, and that they must be allowed to proceed to trial on each of their claims.  (*See generally*

Pls.' Resp. to Def.'s Mot. to Dismiss & for Summ. J. ("Pl.'s Resp."), ECF No. 108.)

Defendants' motion became ripe on July 17, 2015, and this Court held a hearing on the combined motion to dismiss and for summary judgment on February 4, 2016.

## II.    LEGAL STANDARDS

### A.    Motions To Dismiss Under Rule 12(b)(6)

Federal Rule of Civil Procedure 12(b)(6) provides that a party may move to dismiss a complaint on the grounds that it "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "Although 'detailed factual allegations' are not necessary to withstand a Rule 12(b)(6) motion, a plaintiff must plead enough facts to make the claim plausible on its face." *Patterson v. United States*, 999 F. Supp. 2d 300, 305 (D.D.C. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "[M]ere conclusory statements" alleging misconduct are not enough; the plaintiff must provide "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.*

In ruling on a motion to dismiss, "[t]he court must accept as true all factual allegations in the complaint, and the plaintiff should receive the benefit of all [reasonable] inferences that can be derived from the facts alleged." *Patterson*, 999 F. Supp. 2d at 305. "[T]he court need not accept inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint." *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994). The court need not accept the

plaintiff's legal conclusions, even if they are couched as factual allegations. *See Twombly*, 550 U.S. at 555.

### B.     Summary Judgment Under Rule 56

Summary judgment must be granted if the moving party demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court's role is "to determine whether there is a genuine issue for trial," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986), that is, whether the record contains sufficient evidence "that a reasonable jury could return a verdict" in the non-movant's favor, *id.* at 248.

In the qualified immunity context at the summary judgment stage, the "evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Kyle v. Bedlion*, No. 12-CV-1572, 2016 WL 1301043, at *4 (D.D.C. Apr. 1, 2016) (quoting *Tolan v. Cotton*, 134 S. Ct. 1861, 1863 (2014) (per curiam)) (internal quotation marks omitted). The "judge's function at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Tolan*, 134 S. Ct. at 1866 (quoting *Anderson*, 477 U.S. at 249) (internal quotation marks omitted).

In deciding whether the non-movant has provided enough evidence that a reasonable jury could return a verdict in his favor, "the court must first identify the version of events that best comports with the summary judgment standard and then ask whether, given that set of facts, a reasonable officer should have known that his actions were unlawful." *Kyle*, 2016 WL 1301043, at *4 (quoting *Morelli v. Webster*, 552 F.3d 12, 19 (1st Cir. 2009)) (internal quotation marks omitted). "This is because, once the court has determined the relevant set of facts and drawn all inferences in favor of the

nonmoving party to the extent supportable by the record, the reasonableness of the

officer's actions is a pure question of law." *Id.* (quoting *Scott v. Harris*, 550 U.S. 372,

381 n. 8 (2007)) (internal quotation marks and alterations omitted).

### C.   Section 1983 Actions And Qualified Immunity

Section 1983 of Title 42 of the United States Code permits a plaintiff to seek

money damages for the violation of his constitutional rights by any person acting under

color of state law, including an officer of the District of Columbia.  *See Butera v.*

*District of Columbia*, 235 F.3d 637, 645 (D.C. Cir. 2001); *Kyle*, 2016 WL 1301043,

at *3.  Individual police officers count as state actors for purposes of Section 1983;

however, such officers can get qualified immunity in lawsuits brought against them in

their individual capacities.  *See Kyle*, 2016 WL 1301043, at *3.  Qualified immunity

"shields State officials from liability for their discretionary functions 'insofar as their

conduct does not violate clearly established statutory or constitutional rights of which a

reasonable person would have known.'"  *Butera*, 235 F.3d at 646 (quoting *Harlow v.*

*Fitzgerald*, 457 U.S. 800, 818 (1982)).  In other words, "qualified immunity prevents

officials who violate the law from having to defend against lawsuits for money damages

unless 'the legal rules that were clearly established at the time [the action] was taken'

gave those officials 'fair warning' that they were acting contrary to law."  *Kyle*, 2016

WL 1301043, at *3 (quoting *Messerschmidt v. Millender*, 132 S.Ct. 1235, 1245 (2012)).

Once a defendant invokes the defense of qualified immunity, the plaintiff bears

the burden of demonstrating that the defendant is not entitled to its protection.  *See*

*Winder v. Erste*, 905 F. Supp. 2d 19, 28 (D.D.C. 2012).  In evaluating qualified

immunity at the summary judgment stage, the Court undertakes a "two-pronged

inquiry."  *Tolan*, 134 S.Ct. at 1866.  "At the first prong, the Court asks whether the

facts, taken in the light most favorable to the party asserting the injury, show the officer's conduct violated a federal right." *Kyle*, 2016 WL 1301043, at *4 (internal quotation marks, citation, and alterations omitted). "At the second, the Court looks to the legal rules that were clearly established at the time of the relevant action to determine whether they gave the officer fair notice that his conduct was contrary to law." *Id.* (internal quotation marks and citations omitted). These two prongs can be addressed in either order, *see Pearson v. Callahan*, 555 U.S. 223, 236 (2009), and a plaintiff must overcome both in order for liability to attach to a state officer who has claimed qualified immunity.

## III.    ANALYSIS

Counts I, II, and IV are the core of Plaintiffs' complaint. Specifically, in Count I, Plaintiffs allege that the undercover drug operations that led to Witherspoon's arrest constituted state endangerment of Witherspoon in a manner that shocks the conscience and therefore violated his Fifth Amendment rights (*see* SAC ¶¶ 55–67); in Count II, Plaintiffs claim that the MPD officers lacked probable cause to arrest Witherspoon and thereby effected a false arrest in violation of his Fourth Amendment rights, either because they knew that Witherspoon did not have the mens rea to commit the crime or because they knowingly entrapped him (*see* SAC ¶¶ 68–80; Pls.' Resp. at 7–8, 19, 21); and in Count IV, Plaintiffs assert that the officers filed a false report in violation of the Fifth Amendment by falsely asserting the existence of probable cause for Witherspoon's arrest (*see* SAC ¶¶ 93–105). Defendants have moved for summary judgment on these three counts, arguing that, even with all reasonable factual inferences made in Plaintiffs' favor, the record evidence does not reveal any constitutional violations, and

certainly not any violations of clearly established constitutional law, and thus, these claims fail both prongs of the qualified immunity analysis.  (*See* Defs.' Mem. at 12–23.) Defendants also contend that Plaintiffs' various other constitutional claims—including unlawful taking, inhumane prison conditions, failure to protect, and failure to train—are meritless.  (*See* Defs.' Mem. at 23–27.)

For the reasons explained below, this Court concludes that Defendants' combined motion to dismiss and for summary judgment must be granted in full.  With respect to Counts I, II, and IV, no reasonable jury could find that Defendants violated Witherspoon's Fifth Amendment rights to due process or that he was arrested without probable cause in violation of the Fourth Amendment, and therefore, Plaintiffs have failed to clear prong one of the qualified immunity hurdle.  Moreover, the bare allegations in the complaint regarding Counts III, V, VI, and VII are not sufficient to support these constitutional claims; thus, these counts must be dismissed for failure to state a claim upon which relief can be granted.  Furthermore, and finally, with all of the federal claims disposed of in this manner, this Court has decided to decline to exercise supplemental jurisdiction over the remaining state law claims (Counts VIII and IX).

### A.    Plaintiffs Have Not Established The Constitutional Violations Alleged In Counts I, II, And IV Of The Complaint

As explained above, qualified immunity "shields state actors from 'liability for civil damages if their actions did not violate clearly established statutory or constitutional rights of which a reasonable person would have known[.]'"  *Kyle*, 2016 WL 1301043 (quoting *Tolan*, 134 S. Ct. at 1866) (per curiam) (internal quotation marks and citation omitted).  To overcome the qualified immunity barrier to civil liability, a plaintiff must demonstrate that the officer's conduct did, in fact, violate a statute or the

Constitution (prong one of the qualified immunity analysis), and also that the violation was, or should have been, clear to the officer based on the legal rules that were established at the time of the officer's action (prong two).  *See id.* at *4 (internal quotation marks and citation omitted).

Here, Plaintiffs falter at prong one, as explained below.  Even when all inferences are drawn in Plaintiffs' favor, no reasonable jury could find that the undercover buy/bust operation that led to Witherspoon's arrest constituted a clearly established violation of his Fifth Amendment rights, nor does the record support Plaintiffs' assertion that Defendants violated Witherspoon's Fourth and Fifth Amendment rights because the officers lacked probable cause to arrest Witherspoon and falsely reported otherwise.  Moreover, to the extent that Plaintiffs' lack-of-probable-cause contentions are based on the belief that Witherspoon did not have the requisite mens rea to commit the crime for which he was arrested and that the arresting officer knew this (*see, e.g.*, Pls.' Resp. at 7–8, 18–19), the Court finds that there is an inadequate factual basis from which to draw any such conclusion.  And with respect to Plaintiffs' suggestion that the undercover officers effectively entrapped Witherspoon, and that this entrapment vitiated probable cause (*see, e.g.*, Pls.' Resp. at 8), it is well established that entrapment is not a relevant consideration in the probable cause inquiry.  Thus, Defendants are entitled to summary judgment with respect to Counts I, II, and IV of Plaintiffs' complaint.

1. <u>No Reasonable Jury Could Find That The Undercover Drug Operation Violated Witherspoon's Fifth Amendment Right To Due Process</u>

Plaintiffs' first count alleges that the officer defendants violated Witherspoon's Fifth Amendment rights by "plac[ing him] in a dangerous situation" (SAC ¶ 56) when

they asked him to buy drugs, thereby "subjecting him to injury and/or death" (*id.* ¶ 57)

and causing myriad injuries: physical injury, embarrassment, emotional distress,

humiliation, out-of-pocket costs, medical expenses, loss of enjoyment of life, mental

anguish, and "serious and permanent injuries to his body and mind" (*id.* ¶ 64).

According to Plaintiffs, Defendants' "affirmative, reckless, and willful misconduct"

during the buy/bust operation (*id.* ¶ 59) (emphasis omitted) violated Witherspoon's

Fifth Amendment due process rights (*id.* ¶ 60) in a manner that rises to the level of

"state endangerment," a concept laid out in *Butera v. District of Columbia*, 235 F.3d

637 (D.C. Cir. 2001).  In that case, the D.C. Circuit held that "an individual can assert a

substantive due process right to protection by the District of Columbia from third-party

violence when District of Columbia officials affirmatively act to increase or create the

danger that ultimately results in the individual's harm."  *Butera*, 235 F.3d at 651;

*accord Fraternal Order of Police Dep't of Corr. Labor Comm. v. Williams*, 375 F.3d

1141, 1144 (D.C. Cir. 2004).  The Circuit has also established that, to assert a state

endangerment claim successfully, "the plaintiff must . . . show that the District of

Columbia's conduct was 'so egregious, so outrageous, that it may fairly be said to

shock the contemporary conscience.'"  *Butera*, 235 F.3d at 651 (quoting *Cty. of

Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998)).

The summary judgment record in the instant case fails to support Plaintiffs' state

endangerment claim for several reasons.  First of all, although the complaint contains a

laundry list of harms, which are stated in the most extravagant terms,[4] there appears to

---

[4] In Count I and throughout the complaint, Plaintiffs describe Defendants' conduct using sensational
characterizations.  (*See, e.g.*, SAC ¶ 57 (describing Defendants' misconduct as "gross, wanton,
intentional, *affirmative*, reckless, and willful" (emphasis in original)); *id.* ¶ 77 (asserting that
Defendants acted "intentionally, *affirmatively*, wantonly, maliciously, wrongfully, and *egregiously*"

be no *evidence* in the record of any injury to Witherspoon resulting from his participation in the buy/bust operation.  All parties agree that Witherspoon got into Durham's vehicle, purchased marijuana and cocaine with money that Durham provided him, and was subsequently arrested.  But Plaintiffs do not point to any evidence that indicates that Witherspoon suffered any physical or emotional injuries during this interaction, and this Court's review of the record has unearthed none.

Notably, Plaintiffs do not even attempt to *argue* that Witherspoon *actually* suffered any direct harm from the situation; rather, they contend that the situation exposed Witherspoon to undue danger, even if no harm befell him.  (*See* Pls.' Resp. at 19–20.)  Indeed, Plaintiffs' brief points to just two pieces of evidence in support of their state endangerment claim: first, their expert witness, a retired narcotics officer, opined that it was "unprofessional, unethical, inappropriate, and totally wrong" to conduct a buy/bust operation with Witherspoon given his intellectual disability (*see* Pl.'s Resp. at 19–20 (quoting Report of Retired Narcotics Officer Lamar N. Nowell, Sr., ECF No. 75-1, ¶ 2)); and second, Plaintiffs point out that Defendant Hall stated in his deposition that he takes his service revolver with him when he enters a dope house in his capacity as an undercover narcotics officers.  (*See id.* at 20 (quoting Dep. of Christopher Hall, Ex. 5 to Pl.'s Resp., ECF No. 108-14, 93:11–18).)  Neither of these

---

(emphasis in original)); *id.* ¶ 80 (accusing Defendants of "tortuous [sic] acts accompanied with fraud, ill will, recklessness, wantonness, oppressiveness [and] willful disregard of Witherspoon's rights").) While Plaintiffs' liberal use of dramatic adjectives has added some color to their claims, it appears to have come at the cost of clarity, because it is often quite difficult to discern exactly what Plaintiffs are alleging in each particular count.  For example, Count I is entitled "State Endangerment" (a theory of liability under the Fifth Amendment), and sounds primarily in due process, but that count also contains stray accusations that the officers acted "absent probable cause in violation of the Fourth Amendment," which appear to belong in Plaintiffs' false arrest claim (Count II).  (*Id.* ¶ 55; *see also id.* ¶ 58 ("Defendants had no probable cause to arrest, detain and incarcerate Witherspoon".).)  The complaint is full of these inconsistencies, and Plaintiffs' summary judgment briefing is no better.  The Court has done its best to construe Plaintiffs' filings in a coherent fashion.

two statements suggests that Witherspoon suffered any harm during the buy/bust operation, nor does anything in Witherspoon's testimony. And the lack of any injury is fatal to Plaintiffs' state endangerment claim. *See Butera*, 235 F.3d at 651 ("[U]nder the State endangerment concept, an individual can assert a substantive due process right to protection by the District of Columbia from third-party violence when District of Columbia officials affirmatively act to increase or create the danger *that ultimately results in the individual's harm*." (emphasis added)); *see also Fraternal Order of Police*, 375 F.3d at 1146 n.4 (noting this limitation in *Butera*'s holding).

Even if Witherspoon's lack of injury did not doom his state endangerment claim, Plaintiffs have also failed to show that Defendants' conduct was so outrageous as to "shock the contemporary conscience." *See Butera*, 235 F.3d at 651. The requirement that Defendants' conduct shock the conscience is "stringent," and "exists to differentiate substantive due process . . . from local tort law." *Id.* This means that "only the most egregious official conduct" violates due process. *Sacramento*, 523 U.S. at 846. And while "something more than negligence but less than intentional conduct, such as reckless or gross negligence" can satisfy this standard in limited circumstances, *id.* at 849—such as when the plaintiff is used in a planned undercover drug buy, *see Butera*, 235 F.3d at 651–52 (finding that the officers' treatment of the plaintiff under such circumstances could shock the conscience "by meeting the lower threshold of 'deliberate indifference'"); *see Fraternal Order of Police*, 375 F.3d at 1145–46—a police officer only acts with deliberate indifference when he disregards a substantial risk of serious harm of which he is aware, *Farmer v. Brennan*, 511 U.S. 825, 828

(1994), and Plaintiffs have not shown that any such disregard or other reckless behavior on the part of the undercover officers took place in the instant case.

To be specific, although every drug transaction undoubtedly involves some level of danger, nothing in the record indicates that the officers were aware of a substantial risk of serious harm and disregarded that risk when they asked Witherspoon to buy marijuana and cocaine.  Durham asked Witherspoon if he knew where drugs could be purchased and asked that Witherspoon buy him certain drugs, and Witherspoon willingly complied.  (*See* Durham Dep. at 53:11–16, 55:3–19, 59:12–14; Dep. of Kevin Witherspoon ("Witherspoon Dep."), ECF Nos. 101-3 & 108-12, at 20:10–21:13, 23:6– 21, 56:19–57:18.)  Furthermore, the only two men in the car that day (Witherspoon and Durham) both testified that it was Witherspoon, not Durham, who provided the directions to the locations where the drugs were purchased.  (*See* Durham Dep. at 26:19–27:9; Witherspoon Dep. at 20:15–16 ("Q: Okay, and did you show [Durham] where to go?  A: Yeah."); *id.* at 25:22–26:2 ("Q: And did you show [Durham] where to go to or did he already know?  A: No, he never knew, I knew.")  Thus, even if Defendants were previously aware that these locations were associated with the risk of crime, it was Witherspoon himself who guided them there and exposed them to that danger.

Furthermore, Defendants' actions are a far cry from the conduct that courts in this jurisdiction have found to constitute deliberate indifference in the state endangerment context.  For example, in *Briscoe v. Potter*, 355 F. Supp. 2d 30 (D.D.C. 2004), several U.S. postal employees alleged that U.S. Postal Service management knew that the facility where they worked was contaminated with anthrax, but made

affirmative misrepresentations about the facility's safety in order to keep the employees working there. *See id.* at 45. In that case, the prior delivery of an Anthrax-laden letter that had passed through the postal facility had allegedly put Defendants "on notice of the serious consequences that could result from Plaintiffs' exposure to anthrax," *id.* at 46 (internal quotation marks and citation omitted), and Defendants responded by "engag[ing] in a campaign of misinformation designed to keep employees at work[,]" despite the known risk, *id.* No such "gross disregard for a [known and] dangerous situation" is apparent or reasonably inferable from the record in this case. *Id.* Thus, even if Defendants' use of Witherspoon (an intellectually disabled individual) to conduct a buy/bust operation was unethical, as Plaintiffs' expert opined, it was not so outrageous under the circumstances presented here as to shock the conscience and violate substantive due process.[5]

In sum, this Court concludes that no reasonable jury could find that Witherspoon was harmed by the undercover drug operation or that Defendants' conduct constituted deliberate indifference; therefore, Defendants did not violate Witherspoon's Fifth

---

[5] In conducting this analysis, the Court assumes, without deciding, two legal conclusions: (1) that the state endangerment theory actually applies to an individual who *voluntarily* participated in the activity that ultimately caused him harm, like Witherspoon, and (2) that, in such a circumstance, the lesser deliberate indifference standard would also apply. The former is an open question in this circuit, *see Briscoe*, 355 F. Supp. 2d at 48 (citing *Butera*, 235 F.3d at 654 n. 16), and although Plaintiffs' complaint alleges that Witherspoon "was not a willing participant" (SAC ¶ 71), no evidence in the record supports the conclusion that Witherspoon was coerced or otherwise did not willingly participate in the drug transactions. As to the latter question, the *Butera* court concluded that the deliberate indifference standard applies when the police use an individual in an undercover drug buy that the officers had "the opportunity to plan . . . with care." *Butera*, 235 F.3d at 652. The Circuit drew an analogy to the situation of an individual in state custody—a circumstance in which the Supreme Court has held that the lower deliberate indifferent standard applies because prison officials have "the luxury . . . of . . . time to make unhurried judgments[.]" *Id.* at 652 (quoting *Sacramento*, 523 U.S. at 853) (internal quotation marks omitted). The buy/bust operation at issue in this case appears to have been more impromptu than the operation in *Butera*, and therefore less analogous to the custody context and less amenable to analysis under the deliberate indifference standard. But neither party has addressed either of these legal questions. Because the Court concludes that Plaintiffs have failed to make out a state endangerment claim even if the theory does apply and even under the less-demanding deliberate indifference standard, it need not resolve these unbriefed issues today.

Amendment right to substantive due process and are entitled to summary judgment

under prong one of the qualified immunity analysis with respect to Plaintiffs' state

endangerment claim (Count I).

> 2.   Plaintiffs Have Not Shown That Defendants Lacked Probable Cause To
>       Arrest Witherspoon And Thus Violated His Fourth Amendment Rights

In Counts II and IV of the complaint, Plaintiffs contend that Witherspoon was

falsely arrested, and Defendants subsequently filed a false police report, in violation of

Witherspoon's constitutional rights.  (*See* SAC ¶¶ 70, 94.)  These two claims are, in

essence, claims that Witherspoon was arrested without probable cause.  *See Wesby v.*

*District of Columbia*, 765 F.3d 13, 19 (D.C. Cir. 2014), *reh'g en banc denied*, 816 F.3d

96 (D.C. Cir. 2016) ("As with most false-arrest claims, Plaintiffs' claims 'turn on the

issue of whether the arresting officer[s] had probable cause to believe that [Plaintiffs]

committed a crime.'" (quoting *Scott v. District of Columbia*, 101 F.3d 748, 754 (D.C.

Cir. 1996)) (internal quotation marks omitted) (alterations in original)); *Lyles v.*

*Micenko*, 468 F. Supp. 2d 68, 74 (D.D.C. 2006) (explaining that "the existence of

probable cause for the arrest" will defeat a false arrest claim).  (*See also* SAC ¶ 94

(alleging that "Defendants egregiously filed a false report" by "falsely asserting a

finding of probable cause . . .").)  As has been well established, "[p]robable cause exists

where the arresting officer possesses information 'sufficient to warrant a prudent

[officer] in believing that the [suspect has] committed or [is] committing an offense.'"

*United States v. Catlett*, 97 F.3d 565, 573 (D.C. Cir.1996) (alterations in original)

(citation omitted)).  And Plaintiffs here home in on two theories regarding why a police

officer who indisputably observes a person possessing and distributing a controlled

substance—i.e., a seemingly clear commission of the crime for which Witherspoon was

arrested—might nonetheless lack probable cause to arrest that individual.[6]  Plaintiffs'

first theory rests on binding precedent: they insist that probable cause requires "at least

some evidence" as to each element of the particular offense, "including the requisite

mental state[,]" *Wesby* 765 F.3d at 20 (emphasis omitted), and that Officer Durham

knew that Witherspoon did not have sufficient mens rea to commit the drug crime from

which he was arrested due to his mental disability.  (*See* Pls.' Resp. at 7–8, 18–19; *id.*

at 21 ("Mr. Witherspoon lacked mens rea to commit a crime[.]").)  Second, Plaintiffs

suggest that, even if the facts and circumstances appeared to satisfy all of the elements

of the drug crime for which he was arrested, the officers themselves orchestrated the

drug sales at issue, and therefore, they could not have reasonably believed that

Witherspoon was committing a crime.  (*See, e.g.*, Pls.' Resp. at 8 ("Ofc. Durham

directed, orchestrated and supervised mentally incapacitated Witherspoon to execute

drug buys he did not even understand"; Defs.' Mem. at 20 ("Plaintiffs contend that it

was Officer Durham who conceived of and orchestrated the entire series of events,

while Mr. Witherspoon was essentially a passive bystander doing whatever Officer

Durham suggested." (quoting Oral Ruling Denying Summary Judgment, Sept. 24, 2014)

(alteration omitted).)  For the following reasons, neither of these lack-of-probable-cause

theories passes muster in this case.

---

[6] Section 841(a) of Title 21 of the U.S. Code prohibits any person from "knowingly or intentionally . . . possess[ing] with intent to . . . distribute . . . a controlled substance." (*See* Defs.' Mem. at 17.)  This offense is comprised of three elements: (1) knowingly or intentionally (2) possessing a controlled substance (3) with the intent to distribute it.  *Cf. United States v. Tobin*, 676 F.3d 1264, 1279–81 (11th Cir. 2012) (explaining that the offender must "knowingly or intentionally" possess the drug with "intent" to distribute it).

a.      *The Record Does Not Support Plaintiffs' Attempt To Cast Witherspoon As Having Insufficient Mens Rea And Officer Durham As Knowingly Arresting Him Anyway*

To the extent that Plaintiffs have focused on Witherspoon's potential lack of mens rea as the basis for challenging the officers' finding of probable cause (*see, e.g.*, Pls.' Resp. at 18 ("Witherspoon . . . lacks the intellectual capabilities and comprehension to 'knowingly' or 'intentionally' . . . possess with intent to . . . distribute . . . a controlled substance[.]"); *see also id.* at 7–8 ("After a brief moment of conversation it was obvious to Ofc. Durham that Witherspoon was mentally incapacitated with severe speech and language defects. . . .  The circumstances were known to Ofc. Durham that Witherspoon did not commit a crime.")), their argument has some legal merit, because the D.C. Circuit has recognized that an intellectual disability can prevent a defendant from forming the mens rea required for a specific intent crime. *See United States v. Childress*, 58 F.3d 693, 729 (D.C. Cir. 1995).  It is also clear beyond cavil that an officer's knowledge of the suspect's mental state is relevant to probable cause.  *See, e.g.*, *J.H. ex rel. J.P. v. Bernalillo Cty.*, No. CIV 12-0128 JB/LAM, 2014 WL 3421037, at *101 (D.N.M. July 8, 2014) ("The probable cause inquiry depends on facts known to the arresting officer at the time of the arrest.  If the facts known to the officer include information about an individual's disability—and particularly if the information known to the officer about an individual's disability would exculpate the defendant—those facts inform the probable cause calculus." (internal quotation marks and citation omitted)), *aff'd*, 806 F.3d 1255 (10th Cir. 2015). But for Plaintiffs' false arrest and false report claims to survive summary judgment on this theory, a reasonable jury must be able to glean from the evidence presented that Witherspoon lacked the requisite mens rea *and* that a reasonable officer on the scene

21

would have known that Witherspoon lacked the mens rea at the time of his arrest, and in this Court's view, the record evidence simply does not support these twin findings.

The first failing relates to what the record establishes regarding whether or not Witherspoon lacked the ability to form the specific intent required under 21 U.S.C. § 841(a)(1).  To be sure, the psychological evaluations that Plaintiffs have proffered certainly demonstrate that Witherspoon suffers from serious intellectual disabilities. For example, an evaluation from May 2015 found that "Witherspoon's overall ability to think, reason, and interact effectively with his environment is commensurate with that of less than 1% of other adults his age" (Comprehensive Psych. Eval. ("2015 Eval."), Ex. 1 to Pl.'s Resp., ECF No. 108-3, at 6), and a report from July 2012—closer in time to his arrest—generally agreed with this assessment (*see* Confidential Psych. Eval. ("2012 Eval."), Ex. 1 to Defs.' Mem., ECF No. 101-1, at 4).  The 2015 report noted that Witherspoon "exhibit[s] academic skills at around a kindergarten level," and has "an intellectual profile of consistent extremely low functioning across domains."  (2015 Eval. at 10; *see also* 2012 Eval. at 5.)  Moreover, consistent with these reports, certain statements in Witherspoon's testimony indicate that he does not know, or is confused about, various basic facts about the world: for example, he testified that President Obama freed the slaves (Witherspoon Dep. at 58:12–16) and that he did not know what continent he lived on (*id.* at 58:10–11).

But in the Court's view, the psychological reports and testimony do not establish that Witherspoon was altogether incapable of forming the requisite specific intent; indeed, quite to the contrary, the 2015 evaluation specifically stated that Witherspoon "exhibited an adequate vocabulary fund to express and convey his thoughts," and "[h]is

thinking . . . did appear to be reality based, with no evidence of delusions, hallucinations, or psychotic processes." (2015 Eval. at 5.)  Furthermore, in 2015, Witherspoon was "able to orally express and convey his thoughts, needs, and preferences to others" (*id.* at 10), which was also the case during the 2012 psychological evaluation: the examiner noted that "Witherspoon is able to communicate with others in his environment using simple language, phrases and sentences . . .  He is able to follow simple instructions with reminders and functions best in a predictable and structured environment.  He is able to comprehend some of what is shared with him but requires that matters be discussed in simple terms[.]" (2012 Eval. at 6.)  Similarly, although Witherspoon's deposition transcript demonstrates that he does not know certain basic pieces of information about U.S. history and global geography, nothing in his deposition testimony indicates that he is or was unable to form the specific intent required to buy drugs with the intent to distribute them.

Perhaps most significantly, Plaintiffs' own version of the events leading up to his arrest indicates that Witherspoon was able to form the specific intent required to exchange money for goods.  Plaintiffs admit that Witherspoon was on his way to the corner store when the interaction with Durham took place.  (*See* Pls.' Resp. at 6 (citing Affidavit of Lakeisha Witherspoon, Ex. 5 to Pls.' Resp., ECF No. 108-7, ¶ 16).) Witherspoon also testified that he asked Durham to drive him to the liquor store so that he could buy beer. (*See* Witherspoon Dep. at 17:16–19, 18:13–22; Durham Dep. at 12:1–3.)[7]  By his own account, Witherspoon then purchased a can of Icehouse beer at

---

[7] It is unclear from the record whether the liquor store that Kevin Witherspoon and Durham visited is the same as the corner store that Lakeisha Witherspoon sent Kevin to in the first place, but this discrepancy is not material to any issue in this case.

the liquor store, using his own money.  (*See* Witherspoon Dep. at 19:11–19.)  This act—

going to the liquor store with the intent to buy beer, then exchanging money for said

beer—seems to require the same mental state that section 841(a)(1) addresses as applied

to the purchase of drugs, and it is undisputed that Witherspoon was capable of forming

that intent and carrying out the beer-related transaction.  Thus, even taking all

reasonable inferences in Plaintiffs' favor, the record does not support a finding that

Witherspoon was incapable of forming the specific intent required to be guilty of

possession with intent to distribute drugs under 21 U.S.C. § 841(a)(1), as Plaintiffs

maintain.[8]

      Additionally, even if a reasonable jury could find that Witherspoon was

incapable of forming the mental state the statute requires, this Court concludes that no

reasonable jury could find on this record that Witherspoon was so *obviously* incapable

that a reasonable officer would have known that he lacked the requisite mens rea.

Indeed, Witherspoon's own testimony undermines that conclusion.  For example,

Witherspoon admits that he voluntarily got into Durham's car and asked Durham for a

ride to the liquor store.  (*See* Witherspoon Dep. at 17:5–18:14.)  He purchased a can of

beer at the liquor store and got back into Durham's car.  (*See id.* at 19:13–20:2.)

Durham then asked Witherspoon if he knew where he could get drugs, and Witherspoon

said "yeah" and directed him to a building.  (*See id.* at 20:8–19.)  Durham then asked,

---

[8] Although Plaintiffs do not frame their argument this way, the specific intent required to commit a crime under section 841(a)(1) might also be negated if Witherspoon had no understanding of what marijuana or cocaine were—for example, if he thought the marijuana he purchased was simply asparagus, then he might not have knowingly possessed a controlled substance.  However, Witherspoon's own testimony defeats this theory, too.  Throughout his deposition, Witherspoon displays familiarity with the terms "drugs," "weed," and "cocaine" (*see* Witherspoon Dep. at 20:10–14, 21:1–13, 23:6–21), and nowhere does he even suggest that he did not understand the substances that he purchased using Officer Durham's money.

"What can I get for $20.00?" to which Witherspoon replied, "Some weed." (*See id.* at 20:21–21:1.) Durham gave Witherspoon twenty dollars, and Witherspoon entered the building with the money to purchase marijuana, which he brought back to Durham in the car. (*See id.* at 21:1–23:4.) Durham then asked if Witherspoon knew where he could get "the stuff up your nose." (*See id.* at 23:6–7.) When Witherspoon replied, "What is that stuff, up the nose?", Durham clarified, "Like powder, like cocaine." (*See id.* at 23:14–16.) Durham asked again if Witherspoon knew where he could get cocaine, to which Witherspoon replied, "Yes, sir." (*See id.* at 23:17–21.) Witherspoon testified that he then provided the directions to another building; this time he purchased cocaine using money that Durham had provided, and brought the cocaine back to Durham. (*See id.* at 25:7–26:2, 56:19–57:18.) These acts—which Witherspoon admittedly undertook—are entirely inconsistent with Plaintiffs' characterization of Witherspoon as being so obviously incapable of forming the mental state required to violate section 841(a)(1) that a reasonable officer would have known that mens rea was lacking.

Consequently, in this Court's view, no reasonable jury could find from the record evidence in this case that Witherspoon lacked the requisite mens rea to commit the crime of conviction in a manner that was so obvious to the officers who interacted with him that there was no probable cause to make the arrest.

> b.   *Plaintiffs' Entrapment Theory Fails As A Matter Of Law*

Plaintiffs' second theory in support of their assertion that Witherspoon's constitutional rights were violated due to Durham's lack of probable cause for the arrest rests, essentially, on the contention that the officers' actions constituted entrapment. (*See, e.g.*, Pls.' Resp. at 8 ("Ofc. Durham directed, orchestrated and supervised mentally incapacitated Witherspoon to execute drug buys he did not even understand");

Defs.' Mem. at 20 ("Plaintiffs contend it was Officer Durham who conceived of and orchestrated the entire series of events, while Mr. Witherspoon was essentially a passive bystander doing whatever Officer Durham suggested." (quoting Oral Ruling Denying Summary Judgment, Sept. 24, 2014).)  It was on the basis of this theory that this Court denied summary judgment to Defendants on September 24, 2014, and unlike Plaintiffs' mens rea theory, the entrapment theory *does* find support in the factual record.  Specifically, when all reasonable inferences are made in Plaintiffs' favor, the record supports a finding that Witherspoon was on a walk to the corner store—minding his own business—when Durham initiated the interaction.  (*See* Witherspoon Dep. at 15:7–10.)  Moreover, it was Durham who indisputably raised the prospect of acquiring drugs—unprompted—and who provided Witherspoon with the money to facilitate the transactions on Durham's behalf.  "[T]he ultimate fact to be determined by the jury [with respect to entrapment] is whether the defendant was 'predisposed' to commit the crime with which he is charged," *United States v. Burkley*, 591 F.2d 903, 910 (D.C. Cir. 1978), and there appears to be very little in the instant record that suggests Witherspoon was predisposed to commit these drug transactions (particularly when read in the light most favorable to Plaintiffs).

However, the additional briefing that the parties have provided since the initial summary judgment ruling has persuaded the Court that Plaintiffs' entrapment-based theory must fail as a matter of law, because entrapment does not vitiate an arresting officer's probable cause.  Simply stated, as the Seventh Circuit put it: "[e]ntrapment is not part of our Fourth Amendment probable-cause-to-arrest analysis." *Humphrey v. Staszak*, 148 F.3d 719, 724 (7th Cir. 1998).  That is, inasmuch as assessing the

existence of probable cause requires a court to "examine the circumstances [of the arrest] from the view of an objectively reasonable police officer" in order to determine if a reasonable officer would have had some evidence as to every element of the suspected offense, *id.*, courts have long held that entrapment allegations simply do not bear on that determination.  Instead, entrapment is "an affirmative defense of a criminal defendant to otherwise culpable conduct[,]" *id.*—i.e., it "is an *excuse* for a crime, not a *denial* of one."  *Labensky v. Cty. of Nassau*, 6 F. Supp. 2d 161, 177 (E.D.N.Y. 1998) (emphasis added); *see also Torres v. Marquardt*, No. 93-CV-2993 JG, 1997 WL 1068680, at *4 (E.D.N.Y. Apr. 3, 1997) ("[T]he entrapment defense reflects a determination that, although a crime has been committed, no judgment of conviction should result because of the combination of government inducement and the absence of predisposition.").  Thus, "[a]lthough the [entrapment] defense relieves a defendant of his guilt, it does not negate the commission of the crime charged or the existence of any element thereof."  *Id.* (internal quotation marks and citation omitted); *accord Labensky*, 6 F. Supp. 2d at 177; *see also Pinter v. City of New York*, 448 F. App'x 99, 100 n.5 (2d Cir. 2011) ("We need not consider whether [the officer's] methods, which were undoubtedly aggressive, rose to the level of entrapment, because '[w]hile entrapment may be a proper defense in a criminal action, a police officer's participation in such activity does not constitute a constitutional violation.'" (quoting *DiBlasio v. City of New York*, 102 F.3d 654, 656–57 (2d Cir. 1996)).

In this case, then, even if Witherspoon was enticed into committing a crime he was not predisposed to commit, he was not prosecuted for violating 21 U.S.C. § 841(a)(1), presumably because a grand jury serving its "vital function [as] . . . a body

of citizens that acts as a check on prosecutorial power," *United States v. Cotton*, 535 U.S. 625, 634 (2002), declined to issue an indictment.  (*See* Ex. 2 to First Am. Complaint, ECF No. 30-2.)  Witherspoon might well have been able to assert a successful entrapment defense if he had been subject to prosecution, but courts have long determined that that defense does not provide an avenue to attack the probable cause underpinning a suspect's arrest.

In sum, this Court finds that Defendants are entitled to summary judgment with respect to Plaintiffs' Count I (state endangerment), Count II (false arrest), and Count IV (false police report) because Plaintiffs have failed to establish that there was any violation of Witherspoon's constitutional rights with respect to those claims, as the first prong of the qualified immunity analysis requires.  This is because, as explained above, no reasonable jury could conclude on the basis of the record evidence that the buy/bust operation transgressed the boundaries of substantive due process as guaranteed by the Fifth Amendment, and neither of Plaintiffs' two theories regarding why Witherspoon's arrest was not supported by probable cause—that Witherspoon lacked the mens rea required by the statute and/or that Witherspoon was entrapped—can succeed (the former is precluded by the record and Witherspoon's own testimony, and the latter rests on a misapprehension of the governing law).  As a result, Defendants' motion for summary judgment with respect to Count I, Count II, and Count IV will be granted.

## B. Plaintiffs' Other Constitutional Contentions Fail To State A Claim Upon Which Relief Can Be Granted

Defendant has moved to dismiss Plaintiffs' other Constitution-based claims (Counts III, V, VI, VII, and IX) under Rule 12(b)(6), arguing that even as alleged in the Second Amended Complaint, these counts fail to state claims for constitutional

violations.  (Def.'s Mem. at 9.)  The Court agrees with Defendants' conclusion for the following reasons.

        1.  <u>Plaintiffs Have Failed To State A Claim For Unlawful Taking In Violation Of The Fifth Amendment</u>

In Count III, Plaintiffs allege that "Defendants' egregious [and] willful taking of Kevin Witherspoon's money was in violation of the Fifth Amendment."  (SAC ¶ 82.) As Plaintiffs' counsel admitted at oral argument, this claim stems from the allegation that, at the time of Witherspoon's arrest, the police confiscated the seven dollars in cash that he had on his person.  (*See* SAC ¶ 51.)

During the motions hearing, Plaintiffs' counsel clarified that his takings theory was based on the idea that Witherspoon's arrest "was unconstitutional," and that the confiscation of his money was unconstitutional as well because it was "part of the arrest."  (*See* Feb. 4, 2016 Hr'g Tr. at 51:25–52:1; *see also* Pls.' Resp. at 21–22 ("[T]he taking of Witherspoon's money was without probable cause, and in violation of his fundamental Fifth Amendment rights.")  Having already concluded that Witherspoon's arrest was supported by probable cause (i.e., not unconstitutional) under the circumstances presented here, *see supra* Part III.A.2, this Court also finds that there is no basis for Plaintiffs' contention that the confiscation was somehow tainted by the allegedly faulty arrest.  Therefore, Defendants' motion to dismiss with respect to Count III must be granted.[9]

---

[9] Notably, at the hearing, Plaintiffs' counsel conceded that this claim might well be moot in any event, because the seven dollars was eventually returned to Witherspoon, by court order.  (*See* Minute Order of November 2, 2012; Ex. 5 to Defs.' Mem., ECF No. 101-5.)

2.  <u>The Complaint's Allegations Do Not Establish Inhumane Conditions Of Confinement In Violation Of The Fifth Amendment</u>

Count V alleges that the District violated Witherspoon's Fifth Amendment rights by exposing him to inhumane conditions of confinement in the D.C. jail.  (*See* SAC ¶¶ 106–115; Pls.' Resp. at 22 ("Defendants endangered mentally challenged Witherspoon by denying humane conditions of confinement.").)  Specifically, Plaintiffs allege that Witherspoon endured "brutal, violent[] curse words of a homosexual nature" (SAC ¶ 111), which caused Witherspoon to cry and endure both emotional and physical injuries (*see* SAC ¶ 114).  The nature of the alleged physical injuries are not specified in the complaint or any subsequent briefing; at oral argument, Plaintiffs' counsel claimed only that Witherspoon was frightened and cried in his cell.[10]  Ultimately, Count V must be dismissed on two separate grounds: first, because it fails to allege a constitutional violation; second, because it fails to allege that Plaintiffs' harm was the result of a policy or custom of the District, as required for municipal liability under Section 1983.

As an initial matter, it is clear to this Court that Plaintiffs' Count V fails to allege a Fifth Amendment violation.  An official violates the Constitution "for denying humane conditions of confinement only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it."  *Farmer v. Brennan*, 511 U.S. 825, 847 (1996); *see also id.* at 34 ("[N]ot . . . every injury suffered by one prisoner at the hands of another . . . translates into constitutional

---

[10] Indeed, in his deposition, Witherspoon was directly asked whether he was injured in jail. Witherspoon Dep. at 41:1.).  He replied, "No, sir."  (*Id.* at 41:1–2.)

30

liability for prison officials responsible for the victim's safety.").[11]  Plaintiffs here have

not alleged any facts that would give rise to such a finding; instead, according to the

complaint, Witherspoon was merely placed in the general jail population, where his

fellow detainees insulted him.  (*See* SAC ¶ 111.)  While this Court has no doubt that

pretrial detention is a frightening experience, and perhaps especially frightening for

someone with Witherspoon's intellectual capacities, nothing in Plaintiffs' complaint

indicates that Witherspoon faced a substantial risk of serious harm, or that the District

was in any way deliberately indifferent to that risk, even when Plaintiffs' allegations

are taken as true.

Additionally, this Fifth Amendment claim is improperly pled because the count

of the complaint that asserts that Witherspoon was subjected to inhumane conditions

does not allege that Plaintiffs' alleged injuries were caused by a municipal policy or

custom.  Plaintiffs have brought Count V solely against the District of Columbia and

Chief Lanier in her official capacity, and an official-capacity suit against an individual

is "equivalent to a suit against the municipality itself."  *Atchinson v. District of*

*Columbia*, 73 F.3d 418, 424 (D.C. Cir. 1996).  Thus, in effect, Plaintiffs have brought

Count V solely against the District, and while municipalities count as "person[s]" for

the purpose of Section 1983, *see Monell v. Dep't of Soc. Servs. of City of New York*, 436

U.S. 658, 690 (1978), a claim against a municipality—unlike a claim against an officer

in his individual capacity—can proceed only if "the complaint states a claim that a

custom or policy of the municipality caused the violation," *Baker v. District of*

---

[11] Although *Farmer* was an Eighth Amendment case involving convicted prison inmates, courts have long recognized that the rights of pretrial detainees like Witherspoon are protected by the Fifth Amendment, and that similar constitutional standards apply.  *See, e.g., Hardy v. District of Columbia*, 601 F. Supp. 2d 182, 188 (D.D.C. 2009).

*Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003); *see Warren v. District of Columbia*, 353 F.3d 36, 38 (D.C. Cir. 2004) ("[M]unicipalities are liable for their agents' constitutional torts only if the agents acted pursuant to municipal policy or custom . . . *Respondeat superior* liability does not apply."). This means that, in order to avoid dismissal under Rule 12(b)(6), Plaintiffs "bear[] the burden of pleading the existence of a municipal custom or practice that abridge[d] [Witherspoon's] federal constitutional or statutory rights." *Jordan v. District of Columbia*, 113 F. Supp. 3d 278, 282 (D.D.C. 2015) (quoting *Trimble v. District of Columbia*, 779 F.Supp.2d 54, 57 (D.D.C. 2011)) (internal quotation marks omitted).

In this case, the complaint and subsequent briefing are entirely devoid of any allegations regarding the customs and practices of the District with regard to detaining suspects arrested for crimes or otherwise. And because Plaintiffs have nowhere identified a policy, custom, or consistent practice that caused Witherspoon's alleged injuries from his time in jail, apart from and in addition to their failure to state a claim for a predicate constitutional violation, Count V must be dismissed.

3.   The Complaint Provides No Legal Or Factual Basis For Plaintiffs'
     Failure-To-Protect Claims

Next, Plaintiff raises two different "failure to protect" claims, each of which is brought against the District, Chief Lanier in her official capacity, and all the individual MPD officers. Count VI alleges that Defendants violated Kevin Witherspoon's Fifth Amendment rights when they failed to protect him after his release from jail (*see* SAC ¶¶ 116–28), and Count IX alleges that Defendants violated Lakeisha Witherspoon's Fifth Amendment rights when they failed to protect her and her family after Kevin Witherspoon's release from jail (*see* SAC ¶¶ 150–59). Specifically, the complaint

alleges that Kevin Witherspoon's interaction with the police led to his being labeled a police informant in his community, after which he and his family were subjected to death threats, their property was vandalized, and they were forced to move.  (*See* SAC ¶¶ 53–54, 121, 123, 154.)  Plaintiffs further allege that the District contacted Lakeisha Witherspoon and paid for the family to stay at a hotel for some period of time.  (*See id.* ¶¶ 123, 154.)  Plaintiffs claim that Defendants' use of Witherspoon in their buy/bust operation "created a special obligation to protect Witherspoon and his family[,]" which Defendants "accepted . . . by moving them after death threats[,]" but Defendants subsequently breached this duty by "creat[ing] the danger which caused harm to Plaintiffs."  (Pls.' Resp. at 23.)

In general, "a State's failure to protect an individual from private violence, even in the face of a known danger, 'does not constitute a violation of the Due Process Clause.'"  *Butera*, 235 F.3d at 647 (quoting *DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 197 (1989)).  This is because "the Due Process Clause[] generally confer[s] no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual."  *DeShaney*, 489 U.S. at 196.  However, the Supreme Court has recognized a narrow exception: in "certain limited circumstances[,] the Constitution imposes upon the State affirmative duties of care and protection with respect to particular individuals."  *Id.* at 198.  These circumstances are sometimes described as a "special relationship" between the individual and the state.  *See Estate of Phillips v. District of Columbia*, 455 F.3d 397, 406–07 (D.C. Cir. 2006).  Notably, however, the D.C. Circuit has recognized such a relationship only in two circumstances:

(1) where an individual is placed in some form of involuntary custody, *see DeShaney*, 489 U.S. at 199–200 (explaining that "when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being"); *Butera*, 235 F.3d at 647–48 (explaining the custody-based exception to *DeShaney*); and (2) where officials have committed state endangerment (as described at length in *supra* Part III.A.1); that is, where the officials "affirmatively act to increase or create the danger that ultimately results in the individual's harm[,]" *Butera*, 235 F.3d at 651.

In this case, Plaintiffs have not alleged facts that would give rise to Defendants' liability for the harms allegedly suffered by Kevin and Lakeisha Witherspoon after Witherspoon's arrest.  Neither of the Witherspoons were in custody during the alleged vandalism and death threats, which purportedly took place after Kevin Witherspoon was released.  To the extent that Plaintiffs once again seek to rely on a state endangerment theory, as in Count I (*see* Pls.' Resp. at 23 ("Defendants affirmatively created the danger which has caused harm to Plaintiffs.") (citing *Butera*, 235 F.3d at 651)), the only actions Defendants took that even arguably created whatever danger the Witherspoons faced were the arrest and pretrial detention of Kevin Witherspoon (*see* SAC ¶ 121 (asserting that "Defendants' . . . use . . . of Kevin Witherspoon . . . in 'buy/bust' operations . . . is the proximate cause of [his] . . . being labeled a 'police informant' . . . and placing him and his family in grave danger"; *accord* Pls.' Resp. at 23), and this Court has already determined that those actions were lawful.  Plaintiffs point to no case for the proposition that an individual who was lawfully arrested, detained, and released has formed a "special relationship" with the state such that the Due Process Clause

requires the state to protect the individual and his family subsequently, and this Court

has found none.  And because this Court is "mindful of the caution [it] must exercise in

expanding the liberty interests protected by substantive due process[,]" it declines

Plaintiffs' invitation to expand liability so drastically under the Fifth Amendment.

*Butera*, 235 F.3d at 651 (quoting *Harbury v. Deutch*, 233 F.3d 596, 605 (D.C. Cir.

2000)) (internal quotation marks omitted).[12]

     Undaunted, Plaintiffs argue that the complaint stated a Fifth Amendment failure-

to-protect claim because the District's decision to place the Witherspoons in a hotel was

equivalent to Defendants' "accept[ing] the special obligation to protect Witherspoon

and his family."  (Pls.' Resp. at 23.)  Plaintiffs provide no legal support for this

assertion, because none exists.  As this Court has already determined, the District had

no special duty to protect the Witherspoons, and putting them up in a hotel did not (and

could not) bind the District to satisfy a legal obligation that it did not have.  Moreover,

Plaintiffs do not allege that the Witherspoons' relocation to a hotel created or in any

way contributed to the death threats and vandalism they suffered.  Those harms flowed

solely from Kevin Witherspoon's arrest, detention, release, and subsequent reception in

his community—none of which form the basis for constitutional liability, as the Court

has already explained.  Furthermore, and significantly, even if a relationship did

somehow exist between Defendants and the Witherspoons such that the Fifth

---

[12] In their complaint and subsequent briefing, Plaintiffs cite to various District of Columbia state court opinions to support their Section 1983 failure-to-protect claims.  (*See* SAC ¶ 124 (citing *Wanzer v. District of Columbia*, 580 A.2d 127, 132 (D.C. 1990) and *Taylor v. District of Columbia*, 776 A.2d 1208, 1214 (D.C. 2001)); Pls. Resp. at 23 (citing *Wanzer*, 580 A.2d at 132).)  This reliance is misplaced because the cited cases deal with tort liability under District of Columbia common law, *see Wanzer*, 580 A.2d at 132; *Taylor*, 776 A.2d at 1214, and liability under the Fifth Amendment's guarantee of due process "involves considerations not pertinent to the negligence inquiry," such that the two should not be conflated, *Butera*, 235 F.3d at 652 n.18; *see DeShaney*, 489 U.S. at 202 ("[T]he Due Process Clause . . . does not transform every tort committed by a state actor into a constitutional violation.").

Amendment required the District to protect them after Witherspoon's release, Plaintiffs have not alleged any breach-related conduct that could be considered conscience-shocking, even under the lower deliberate indifference standard.  In other words, the constitutional standards must be satisfied even when a constitutional right has been implicated, and Plaintiffs' complaint contains no allegations that any of the Defendants were aware of a substantial risk of serious harm to the Witherspoons following Kevin Witherspoon's release and subsequently ignored that risk.

In short, Plaintiffs failure-to-protect counts do not state viable claims under the Fifth Amendment, because Plaintiffs have failed to allege facts that would give rise to an affirmative obligation on the part of Defendants to protect the Witherspoons after Kevin Witherspoon's release from pretrial detention; and, even if such an obligation did exist, Plaintiffs have failed to allege that Defendants' conduct was so egregious as to violate the Plaintiffs' due process rights.  Therefore, Count VI and IX must be dismissed.

### 4.  Count VII (Failure to Train)

Finally, Plaintiffs allege in Count VII that the District's failure to train its officers in dealing with intellectually disabled individuals led to the violation of Kevin Witherspoon's First, Fourth and Fifth Amendment rights.  (*See* SAC ¶¶ 129–43.) Plaintiffs have brought this claim solely against the District, and "in considering whether a plaintiff has stated a claim for municipal liability, the district court must conduct a two-step inquiry."  *Baker*, 326 F.3d 1306.  First, the Court "must determine whether the complaint states a claim for a predicate constitutional violation."  *Id.* Second, "the [C]ourt must determine whether the complaint states a claim that a custom or policy of the municipality caused the violation."  *Id.*

In this case, Plaintiff plainly fails to clear the first hurdle.  With respect to the complaint's First Amendment contentions (*see* SAC ¶ 131; Pls.' Resp. at 23), nowhere in the complaint or the subsequent briefing do Plaintiffs even attempt to explain how the First Amendment is implicated by the arrest and detention at issue in this case, and bare legal assertions are manifestly insufficient to survive Defendants' 12(b)(6) motion. *See Kowal*, 16 F.3d at 1276.  The Fourth and Fifth Amendment allegations are subject to dismissal for the reasons already discussed.  That is, as the Court has already found, Plaintiffs have not established that the District or its officers violated Witherspoon's rights under the Fourth or Fifth Amendments.  *See supra* Parts III.A–B.2.  Therefore, Plaintiffs have failed to allege a predicate constitutional violation upon which to base their claim for municipal liability, and Count VII must be dismissed.

### C. The Court Declines To Exercise Supplemental Jurisdiction Over The Remaining State Law Claims

At this point in the analysis, this Court has concluded that none of Plaintiffs' constitutional claims survive Defendants' omnibus motion for summary judgment and motion to dismiss.  Plaintiffs have made no claim to diversity jurisdiction (*see* SAC ¶¶ 4–5); therefore, "the complaint contains no further federal causes of action over which this court has original subject matter jurisdiction." *Runnymede-Piper v. District of Columbia*, 952 F. Supp. 2d 52, 60 (D.D.C. 2013).  The two remaining counts of Plaintiffs' complaint—negligent training and supervision with regard to Kevin Witherspoon (Count VIII), and negligent training and supervision with regard to Lakeisha Witherspoon (Count X)—are state law claims with respect to which this Court originally had supplemental jurisdiction, because "they formed 'part of the same case or controversy' as the federal claims over which it had original jurisdiction." *Kyle*, 2016

WL 1301043, at *12 (quoting 28 U.S.C. § 1367(a)).  But now that the federal claims have been resolved, this Court must decide whether to retain jurisdiction over the pendent claims.  *See Ali Shafi v. Palestinian Auth.*, 642 F.3d 1088, 1097 (D.C. Cir. 2011) ("Whether to retain jurisdiction over pendent . . . claims after the dismissal of the federal claims is a matter left to the sound discretion of the district court[.]").

"General equitable factors guide the decision whether to exercise supplemental jurisdiction, including judicial economy, convenience, fairness, and comity." *Kyle*, 2016 WL 1301043, at *12 (internal quotation marks and citation omitted); *accord Shekoyan v. Sibley Int'l*, 409 F.3d 414, 424 (D.C. Cir. 2005).  As the Supreme Court has noted, "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered . . . will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988).  Moreover, "the D.C. Circuit has cautioned that the Court has 'an obligation to exercise its discretion to remand the case to the District of Columbia courts once the federal question, like Elvis, ha[s] left the building.'" *Kyle*, 2016 WL 1301043, at *12 (quoting *Araya v. JPMorgan Chase Bank, N.A.*, 775 F.3d 409, 417 (D.C. Cir. 2014)).

In the instant case, the Court has determined that these factors weigh in favor of declining to exercise jurisdiction over the remaining claims.  Plaintiffs' state law claims sound entirely in District of Columbia tort law, an area of law far more familiar to the District of Columbia Superior Court.  Furthermore, although this case has had a protracted procedural history in federal court, none of the work put in to date has addressed Plaintiffs' state law claims.  Considerations of comity and fairness also point

in favor of allowing Plaintiffs to pursue their claims, should they choose, in state court.
*See Shekoyan*, 409 F.3d at 424; *Runnymede*, 952 F. Supp. 2d at 61.  Therefore, this
Court will dismiss the remaining state law claims without prejudice.  *See, e.g.*, *Kyle*,
2016 WL 1301043, at *13 (noting that "no unfairness attaches to [the] decision [to
dismiss the remaining state law claims], because section 1367(d) of Title 28 of the
United States Code 'tolls the statute of limitation during the pendency of the federal
case and for at least 30 days thereafter'" (quoting *Robinson v. Pezzat*, 83 F.Supp.3d
258, 271 (D.D.C. 2015))).

## IV.    CONCLUSION

None of Plaintiffs' constitutional claims can survive Defendants' motion under
Rule 12 and Rule 56.  Plaintiffs have failed to establish liability under prong one of the
qualified immunity analysis with respect to Plaintiffs' state endangerment, false arrest,
and abuse of process claims (Counts I, II, and IV), because no reasonable jury could
find that the officers who arrested Kevin Witherspoon lacked probable cause or that
their actions during the buy/bust operation violated his Fourth or Fifth Amendment
rights.  In addition, Plaintiffs' claims for unlawful taking, inhumane conditions of
confinement, failure to protect, and failure to train (Counts III, V, VI, VII, IX) must be
dismissed, because, with respect to each, Plaintiffs' complaint fails to state a claim
upon which relief could be granted.  Accordingly, as explained above and as set forth in
the accompanying order, Defendants' motion for summary judgment is granted with
respect to Counts I, II, and IV, and judgment will be entered in Defendants' favor on
those counts; Defendants' motion to dismiss is granted with respect to Counts III, V,

VI, VII, IX, and those claims will be dismissed; and Plaintiffs' state law claims (Counts

VIII and X) will be dismissed without prejudice.


DATE:  June 9, 2016                           *Ketanji Brown Jackson*
                                              KETANJI BROWN JACKSON
                                              United States District Judge